in the Little District of Florida to sit with us this week. Judge Conway previously served as Chief Judge in the Little District of Florida. We've been friends and colleagues for a long time, all of us. In fact, I think we have an all-Florida panel this morning. So, welcome Judge Conway. It's a pleasure to have you and we appreciate your helping us with our docket this week. Thank you. And we have three cases that are scheduled for oral argument this morning. First is United States v. Dunning. Mr. Doss is here for the appellant. Mr. Billingsley for the appellee. Mr. Doss, you may begin. May it please the Court. My name is Jeff Doss and I represent the appellant in this case, Jonathan Dunning. The rule that we ask this Court to apply is twofold. One, when there is undisputed exculpatory evidence in the record, a judgment of acquittal must be entered. And two, when there are undisputed gaps in the inculpatory evidence, a judgment of acquittal must be entered. After a multi-week trial with dozens of witnesses and hundreds of exhibits and almost 200 pages of briefing before this Court, the government has not identified any evidence to the following. One, that Mr. Dunning made a knowingly false statement to anyone. There are no lies in the government's brief that it's identified. And two, that Mr. Dunning received any money to which he was not otherwise entitled according to the government's own undisputed evidence in its case-in-chief. Taken together, the absence of those two pieces of evidence conspire and result in the conclusion that there was no fraud committed by Mr. Dunning and a judgment of acquittal must be entered. Well, can I, can I ask you about the Norwood building allegations? Wasn't there evidence that the people on the board did not remember ever approving the transfers? Yes, Your Honor. Okay. How can that not be evidence that transfers were made without appropriate authorization? Your Honor, this particular board for BHC was a policy-setting board rather than a governing board. Terry Birney, a member of that board, testified for the government and said he was an accountant and he actually didn't even receive the accounting statements or the financial statements for BHC unless he specifically asked for them. Under BHC's regulations, the board was there to set generalized policy. Flora Blackledge, another member of the board, testified. Kimberly Patton, another member of the board, testified. Terry Birney is a member of the board, testified. All three of them agreed that the day-to-day operations of BHC were delegated to the management of BHC. So it wouldn't have necessarily been wrong or criminal or evidence that a criminal transaction had occurred simply because the transaction to begin with. The government would have had to present evidence that the people in charge on the financial side of BHC did not approve the transfers? That would have been helpful evidence, Your Honor. Helpful but not enough? Well, it would have depended on what the particular people in the financial department said. For example, if the people said we were simply unaware of this transaction, that may be a closer question. If they said, for example, we affirmatively did not know about this and when we saw this transfer of money, we asked questions and we couldn't figure out where it came from or what happened, that's a different scenario. But what we have here is a sheer absence of evidence as to the management of BHC that anyone had affirmatively not approved it or when they discovered it, that they said, what is going on here? This is not an appropriate transaction. What we have, though, after this transaction goes through is in the audited financial statements of BHC, a receivable in the amount of $652,000 being booked showing an amount owed by Mr. Dunning's company to BHC, which accounts for at least one of the wire transfers. The remaining $400,000 that gets wired out in December of 2009 to purchase the Norwood property is a mystery. We have no idea how that gets accounted for, what happens to it or anything along those lines. There was a portion of it, right, that whatever happened on the front end, there was a portion of that that was not repaid, right? That gets into the question of how much money was owed by BHC to Mr. Dunning's companies. Well, you're talking about offsets, right? Yes, Your Honor. Okay. I just wanted to ask you those questions about the Norwood transaction. I didn't want to take up all of your time. What about the 2030 building? Yes, Your Honor. You said there's exculpatory evidence in the record? I think on that ... Go ahead. I'm sorry, Your Honor. I guess what I'm trying to figure out is was there any evidence to show that the $628,888 that Dunning supposedly used to renovate that building was actually used for renovating the space that Birmingham Healthcare was supposed to rent? Yes, Your Honor. There were draw requests presented in the case that showed that the amounts were being drawn against the loan for that building. The bank was approving them, that sort of thing. There's definitely a question in the record about how much improvements actually happened to the 2030 building, but there is no dispute that the money was spent toward that goal of renovating it. Okay. Well, we've got a series of a lot of complicated business transactions here. There are several transactions, and so we have to look at the evidence in a light most favorable to the government. Sheila Parker was the government's primary witness in this case. She was involved in all of these transactions. She pled guilty, and she was a cooperating witness. And so why can't we look at the record in this case, principally Ms. Parker's testimony, and determine that there was enough evidence upon which a reasonable jury could rely to conclude that he's guilty of bank fraud and wire fraud and conspiracy and money laundering? And two responses to that, Your Honor. The first is Ms. Parker pleaded guilty to offenses unrelated to those which Mr. Dunning was charged with. She had independent theft charges from various entities. She was involved in all of these transactions. Yes, Your Honor. And during the government's case in chief, when she was asked the question, did you and Mr. Dunning enter into an agreement to commit crimes, her answer was an unequivocal no. So the information that she was supplying about the mechanics of these transactions, we do look at that in a light most favorable to the government. I completely agree. The issue becomes what inference do we draw from the sheer existence of the business transactions? The government here presented significant evidence confirming that certain transactions in fact occurred. But to extrapolate from that that the transactions amounted to fraud, that's where the inferences in the government's case become unreasonable. Well, the jury can infer, can make inferences from the circumstantial evidence, right? Yes, Your Honor. And so I guess your argument is that if we look at the record, there's, what's missing is that any intent to defraud or knowledge on the part of Mr. Dunning. But what do we do with the email from Jimmy Lacey that says our, what does he say here? Our collaboration is a conspiracy, a conspiracy that is essential to our success. I mean, there's a lot of things that the jury can connect in order to reach the determination that it did, it seems to me. Why am I wrong about that? With the Jimmy Lacey email, Your Honor, two responses there. One, nobody at trial testified about anything concerning that email. No one had ever seen it. In fact, the witness through whom the government introduced it had no idea what the email was. And that goes into one of our evidentiary challenges, which is that email was improperly admitted at trial because of that very fact. The person through whom it was admitted didn't even know what the email was. There was nothing to suggest that Mr. Dunning ever received it. There was nothing to suggest what Mr. Lacey meant by it or anything along those lines. Was it introduced through? Mr. Bernie, a board member of BHC, who knew nothing about it, Your Honor. He was not copied on it or was not a recipient? No, Your Honor. The $85,000 Jaguar that he got funding from that he purchased, he didn't fill out an application, didn't have a credit check, didn't receive the approval of the board. Jury factored that into its consideration? Yes, Your Honor. And to that point, with the bank fraud statute, it's not imposing record-keeping requirements for a credit union. And that's the disconnect in the government's evidence. There may be bad record-keeping practices. There may be bad banking practices. But that doesn't transform into a fraudulent activity where Mr. Dunning is trying to deprive the bank of money it was owed. There was nothing false about the disbursement of funds for the purposes of leasing that car or purchasing that car. So, again, that's a case where the government undeniably proved that the transaction occurred. There's no question. Well, Mr. Dunning didn't pay for that Jaguar, did he? Well, it came from the BHC funds. It was used to pay that, yes, Your Honor. And in that case, what we have is Sheila Parker testifying for the government that Mr. Dunning told her to do that because he believed he was owed money. Another undisputed fact from Ms. Parker was that she had calculated over a million dollars of amounts owed by BHC to Mr. Dunning. The second point there is she's testifying that she's keeping Mr. Lacey apprised of these sorts of transactions, and he was the CEO of BHC. He would have been the management who the board was looking to to handle those financial transactions. So, again, we don't have anything false or fraudulent about that transaction concerning the Jaguar. It's just the transaction occurred and the government's extrapolations from it. And then he didn't want the board to know about it. And so that demonstrates guilty knowledge, which is what you say is missing from the evidence. And there's no evidence, Your Honor, that anybody was affirmatively concealing it. In fact, the board members testified that, and I see that my time has expired. May I briefly answer that? There's no evidence that anybody was affirmatively concealing financial information from the board. The board testified to the extent we wanted any financial information, we were given it. And in fact, they were given the opportunity to sit down with the outside auditor each year after he conducted the audit of BHC, ask questions, and questions were answered. So there was transparency available to the board to the extent they ever asked for it. All right. We've reserved some time. Mr. Doss, we'll hear from Mr. Billingsley. Good morning. Michael Billingsley for the United States. May it please the Court. Let me first just dispute the fact that he's saying there was undisputed evidence of anything in terms of Mr. Dunney's conduct being criminal. He said that there was undisputed evidence that he was owed money. That's simply not true. The evidence, if you look at the government's closing argument in this case, that was a big part of the argument, that this idea that Birmingham Health Care owed him money was heavily disputed. But more important than that, it was disputed by the evidence in the case. Let me just talk about a couple things. First of all, if the counts of conviction dispute that he was owed money, for example, you brought up the Norwood building, a building that he used Birmingham Health Care funds to buy for himself, then turned around and leased it to Birmingham Health Care, charging them money to pay rent for a building that they bought. Well, that wouldn't have been illegal if Birmingham Health knew about the loan to him. That's not illegal. No, there's absolutely no evidence that they were. I know, I know. Hold on. So, there's a lot of evidence in this case, but here's the feeling I get from reading both sides' briefs, and you tell me where I'm off. Mr. Dunning's brief seems to say, not concede, but almost acknowledge that Mr. Dunning may have enriched himself in a way that seems wrong because of his associations, his connections, the people he controlled, et cetera, et cetera, but the government didn't present any evidence of outright fraud. You seem to say he unlawfully enriched himself so much that there had to be some criminal wrongdoing. So, what I want to do is ask you if you could give me a one, and you may not be able to, and if the answer is no, just say no, and we'll move on to the next one. I want a one-line answer on each set of transactions on what made his conduct criminal. So, for example, the plaza building, what did he do that was fraud in the criminal sense? Okay, so we'll start. Plaza building. Okay. What did he do that was fraudulent? He was still the CEO of Birmingham Healthcare at the time. He obtained an appraisal that valued the building at $6 million, and he says there's no evidence that he knew of that appraisal, but we just submit that requires unreasonable inference because the appraisal was conducted. But you had an appraisal. You had an appraisal that nobody was acting on. Nobody wanted to buy the building. It had sat dormant for years. They hadn't put the building on the market, Your Honor. They were using it. They were the tenant. Not the tenant, but they were the owner of the building. They had tenants as well. There's evidence in the notes of the board meetings that this thing had sat without offers for a while. That was before they purchased it. Yes. But at the time they owned it. They hadn't put it on the market. They weren't trying to sell it. This was Dunning bringing it to him as an idea, Dunning and Lacey. And so your claim is that because another outside entity obtained a higher appraisal, the obtaining of a lower appraisal after the fact makes a subsequent real estate purchase criminally fraudulent. Your Honor, it's not an outside entity. It's Dunning that obtained the appraisal. That was a $6 million appraisal. I said outside. Well, he was CEO of Birmingham Healthcare at the time. Where did he get the $6 million appraisal from? He got it from a bank. And the bank says in the appraisal that they conducted the appraisal for purposes of a synergy entity. Right. Dunning is the driving force behind all the synergy entities. Okay. Wait, wait. You're saying that the obtaining of the appraisal was fraudulent? No. No, Your Honor. What's fraudulent? Telling the board that he's offering them 90 percent of the appraised value without telling them about that appraisal. The second part is that the appraisal, the difference in the value of the appraisal. Hiding the appraisal is what? Withholding. And he had a fiduciary duty. The board recognized that can be an aspect of a duty to disclose. He didn't inform them that there was this higher appraisal, the value of the building. When he went in there with Lacey and encouraged them to sell the building to him for what he said was 90 percent of the appraisal value, 90 percent of a lower appraisal value. How do you know that that first appraisal made sense given the wide gulf in disparity between the two values? Well, there was a lot of evidence about why the values were different. And the values were different because. Did anybody testify that the first appraisal was correct? Well, it depends on. Yeah, I mean, you know, I don't remember the witness's name, but I think the witness had conducted the appraisal. But if I could explain just why there's this difference, Your Honor, it's because if I'm going to buy a building, it's going to be a lot more valuable to me. Didn't the bank sign off on the difference between the appraisals? The two different banks. I know. The bank that loaned the money at the end of the day. Wasn't there an email from one of the bank officials speaking about the gulf between the two appraisals? Right. And that's not. The reason there's a difference in value is because it depends on who's going to bear the cost of maintenance, property taxes, whether it's going to be the tenant or the landlord. The $6 million value was based on an assumption that the tenant would bear those costs. And that's, in fact, what happened. Birmingham Health Care bore those costs once they sold the building to Dunning. And so they ended up paying more than they were as owners of the building as renters of the building because of the deal that they went through with Mr. Dunning. Why were they required to notify the seller of the value of the first appraisal? Why were they required to notify them of that? Why was Mr. Dunning? Yes. Well, for one thing, because he had a fiduciary duty, he was still CEO of Birmingham Health Care. He's trying to buy the building from Birmingham Health Care. He's a CEO. He knows there's this $6 million appraisal, which, by the way, he then uses after he buys the building to go obtain a, I think, $1.3 million line of credit based on the equity in the building. So he believes in the value of the appraisal. If there was no fiduciary duty owed, is there criminal bank fraud? I don't, you know, we've talked about this in the sense that I... Answer. The answer has to be no. Well, I mean... Right. If you and I are, if I want to buy your building, right? Right. And we go out, the two of us go out and we get an independent appraiser and the appraiser says $2 million. I don't tell you that I've done my own appraisal with another outside entity that I don't control. And that entity has said, that building's worth four. I don't tell you about that appraisal that I've secured on my own. You sell me the building for two. Have I committed bank fraud? No, I don't think there's an arms leak transaction. You don't have to inform me of every appraisal you've got. Absolutely not, Your Honor. Okay, so this hinges on his fiduciary duty status? I think it's more than that. What does it hinge on? It's since that he and Lacey, and you referenced the email, there's evidence that they were in a conspiracy together. And this is part of a conspiracy charge, not a bank fraud charge. It's part of the... There were no bank fraud charges arising out of the Plaza building transaction? No bank fraud. Wire fraud? I'm not sure about wire fraud based on... Okay, bank fraud, wire fraud. Based on... There were specific substantive fraud charges based out of each of these buildings, although they were part of the overall conspiracy too, right? Well, I'd have to look at, drill down on, and I can do that for the court if it wants me to, to drill down on whether they were... Okay, so tell me why this is wire fraud, unless your position is that his fiduciary duty status with BHC made it criminal? Well, the other thing is, what I'm trying to say and probably not doing a good job of, is he goes in there, and he is the CEO, and Lacey as the chairman of the board, and there's evidence that they're in this together as a conspiracy. They go in and say, this is going to be good for Birmingham Healthcare, it's going to lower your costs. That wasn't true, because again, Birmingham Healthcare ended up paying all the maintenance, all the utilities, all the expense of the building. And Birmingham Health didn't know that? No, one of the board members... Didn't know they were going to have to pay the cost of maintenance? No, no you're right. Had to know that when they signed the contract, how could they not know? Well, after the fact, after the building sold and they enter into the lease agreement, the problem with this case... So the criminal conduct is the sale or the lease agreement? Well, it's the sale. Then it's not the lease agreement. Your Honor, the problem with this case... This is the problem I'm having with this case, on your side. Okay. There's tons of evidence, and again, I haven't read the trial transcript, but it looks to me like Mr. Dunning did everything he possibly could to enrich himself. The question is whether or not those distasteful acts that he committed amounted to actionable criminal fraud. And starting out with this plaza building transaction, if in our little hypothetical, you're not sure that I've committed wire fraud or bank fraud, I need to know why Mr. Dunning committed bank fraud with the plaza building or wire fraud. Just to be sure this is clear, Mr. Lacey was board chairman at the time of the sale. Dunning was CEO of Birmingham Healthcare. Once he left Birmingham Healthcare and went to set up the Synergy Organizations, Lacey became CEO of Birmingham Healthcare. So when they're negotiating these lease agreements, if they're co-conspirators and the evidence shows that they were, then there's no legitimacy to that agreement. So when he gets Birmingham Healthcare- Oh, that's not necessarily true. That doesn't mean that they couldn't have entered into a legitimate transaction. No, but it's evidence that the transactions they didn't enter into were not legitimate. I mean, he- What's not legitimate? Okay. Was the sale of the plaza building criminally actionable? Yes, it represented- Because what fraud was committed in the sale? He concealed material facts. What did he conceal, the appraisal? The board member testified, if we had been aware of that appraisal, it would have changed the way we would have structured the deal because our whole point was to get out of it paying less than we were, and that's not what happened. So it's not that they paid, or is it that they paid more after they got into the lease? Is it just the hiding of the appraisal? I'm sorry, I'm having trouble separating because there's evidence. You can certainly make the reasonable inference that Dunning and Lacey knew that's what's going to happen when they bought the building. Fine. What makes it criminal? Is it the hiding of the appraisal, or is it the increased cost with the lease agreement after the sale, or both? I think it's both. It's a combination because at the time of the sale, there's a reasonable inference that they knew that's what was going to happen. In fact, I think in the $6 million appraisal, there's a statement that the tenant's going to bear these costs. If the lease agreement had not been so one-sided, is the sale fraud? I think so, because they're misrepresenting the value of the building to the board. They're misrepresenting. And again, I think it's significant, and I'll cite a case that's not in the brief because of not a chance to respond to the reply brief. USV De La Mata, that's 266 Fed 3rd, 1275, pinpoint sites 1293 through 94. The fiduciary relationship makes a difference here in terms of whether he had a duty to disclose this to the board. Right, so that is the linchpin of your argument. Without that, it falls. I don't want to concede that that's the only thing that's important here, but it certainly is significant. If he had no fiduciary duty, where's the crime? Because he's conspiring with the chairman of the board to accomplish it, Your Honor. Before you leave that point, there's evidence in the record that, what is it, Dunning paid Lacey $25,000? Thank you, Your Honor. Yeah, that's what y'all referred to the email, and this was right after the $6 million appraisal. He pays him $25,000, and the email is... And then after that, he says, what, our collaboration is a conspiracy that is essential to our success? That's correct, and when you talked about the witness who testified about the email, first of all, he stipulates the authenticity of the email, so there's no issue about whether it should have been admitted on that ground, but the board member was asked, were you aware of this? Would this have affected your decision in terms of whether to sell the building if you had known that Mr. Dunning had paid Lacey $25,000 within days of this appraisal, and then Lacey had sent this email? Of the first or second appraisal? That was the $6 million appraisal. Okay. With just a few minutes left, I just want to dispute this idea that... But the judge should have let the context evidence in, though, because the email is in quotes. Right. So it's not really... Lacey is quoting something else, and the judge didn't let the something else in. Well, because the something else was a magazine titled For the Record. That was the subject line of the email, was For the Record, so their idea was this has something to do with it. But For the Record is a common expression. There was no other connection between the email or the quote to the magazine, none. But why did you object to its admission? It wasn't relevant. In some ways, it wasn't relevant. How could it not be relevant? The magazine has the same title as the email. For the Record. There's a TV show in Alabama that used to have For the Record. Were they going to introduce... They could have introduced that, too. I mean, you just don't think the jury should have paid attention to it, but that doesn't mean it's not admissible. Well, I certainly don't think the judge abused her discretion in excluding the evidence on the basis that it wasn't relevant. There wasn't a connection. I've been told, but this is the trial attorney's here, that we didn't object. She was here. This was a huge record, as you know, that we did not object to that. So I guess Judge Rothstein excluded it, even though we didn't object. But anyway, it wasn't improper for her to do so. It didn't abuse... It wasn't abuse of discretion because it was not relevant. My time has expired. Thank you, Your Honor. We would just ask that you affirm the convictions. Thank you. Mr. Billingsley, we'll hear again from Mr. Dunn. Mr. Dawes. May it please the Court. In response to the Plaza transaction, a couple of points on that. Keith Covington testified for the government, and that's at page 315 of the trial transcript. He was with Wachovia Bank, and he was asked the question. So you at Wachovia Bank were aware of a $6 million appraisal, and you were also aware of a $3 million appraisal. But you went with the $3 million appraisal because you thought that was a better fair market value for the Plaza building, and he answered, yes, that's correct. So what we have here is the government taking the suppression of something that is not truer or falser or more correct or less correct than the actual appraisal on which the board relied in trying to convert the bank. But the bank wasn't making the decision about whether to sell the property or not. Correct, Your Honor. And so whether the bank decided to go with the lower appraisal, having notice of the first one, doesn't tell you whether or not there was fraud committed in keeping the first one from the people who were deciding whether to sell the building and under what conditions. Absolutely, Your Honor. And to that, it goes to the fundamental problem with the Plaza building transaction, which is what we have is arguably, assuming the worst, the suppression of an appraisal. It's not the suppression of a fact, the existence of a value. The value is not fixed. There was no evidence that Mr. Dunning influenced any of these appraisals or talked to any of these appraisers. Nobody's claiming that the appraisal was in and of itself defective. It's the withholding of information that's allegedly the problem. And on the fiduciary duty point, Your Honor, first, this argument is essentially new. This is the first I've heard of a fiduciary relationship being the trigger for the fraud claim. The government never argued in this massive trial that he had a fiduciary relationship when he was wearing two hats during some of these transactions? I'm unaware of that argument at trial. There may have been that argument at trial. On appeal, I'm unaware of that argument being asserted as the basis for the Plaza building fraud claim. So as to the fiduciary duty issue, that's a very fact-specific issue that would require detailed analysis of the evidence in this record. But the simple fact is there's no evidence in the record showing that Dunning was aware in February of 2008 that that appraisal in September of 2007 existed. The only evidence is in July or June of 2008, there's a document in a bank file which makes reference to another appraisal. Now, presumably, I suppose Mr. Dunning told the bank about that. Who got the first appraisal done? It was Capital South Bank, Your Honor. No, who got it done? Who asked for it? Capital South Bank. That's who the appraiser testified. Because they were doing what? They were appraising the property and when asked specifically. For what purpose? In the appraisal report, it says that there's going to be a transfer of title from Birmingham Health Care to Synergy, an entity to be formed. Those are both entities where Mr. Dunning is involved up to his eyeballs. Yes, Your Honor. Absolutely. How could he not have known? I think there's a distinction between knowing that perhaps an appraisal is to be performed and what the appraisal actually says. So he never got it? There's no evidence that he ever got it. How can that not be a fair inference for a jury to draw that if an appraisal is being done by a bank in anticipation of a proposed transaction between two entities, that the person who is intimately involved with both entities will not know how that appraisal came out? If the government had presented any evidence, Your Honor, that, for example, the appraisal was found in Mr. Dunning's files, that might be a reasonable inference that, okay, it's in his files. He probably saw it. He probably received it. But the only evidence presented on this appraisal was from the appraiser. That's it. There was no evidence presented from the bank, Capital South Bank, which commissioned the appraisal. So an equally plausible inference is that he never got it. And also equally plausible inference is... All right. Isn't that for the jury to figure out then? No, Your Honor, because if the evidence sits in equipoise, if it is equally plausible that it could be innocence, if it's equally plausible that it could be guilt, that must be a judgment of acquittal. That's not correct. In United States v. Louise, which we've cited in our... If I say X and you... We're both eyewitnesses to a crime, okay? We're the only two witnesses to the crime. There's nobody else. There's no documentary evidence. There's no video evidence. There's no forensic evidence. It's you and me. And I say X and you say absolutely not X, Y. What can the jury do in that case? The jury can weigh the credibility of the witnesses and decide between those... Even though each one is equally plausible. But here we have a gap in the evidence, Your Honor. Well, then that's a different argument. It's not that equally different inferences can't be taken by a jury one way or another. Absolutely, Your Honor. I guess the point is when there's a gap in the evidence like there is here, then it becomes a question of what inference becomes reasonable. And it's not a reasonable inference to say not only did the bank commission the appraisal, the appraiser testified that he never had any communications with Mr. Dunning, and that's it. And then to infer from that that not only Mr. Dunning had awareness of the appraisal being commissioned, but also that he knew the results of the appraisal and he had a copy of the appraisal, et cetera, et cetera, thereby allowing him to provide it to BHC, that gets into the territory of unreasonable extrapolations from the evidence. And that's the problem with the government's case. They do prove it in June or July of 2008. Oh, and I see my time has expired if I could briefly conclude that answer. Thank you. What we have here is the government proved in June or July of 2008 that he had been aware of it. That's the only evidence. There's no evidence at February of 2008 when the sale occurs. Thank you. Thank you, Mr. Billingsley and Mr. Doss.